IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE CHARGE ENTERPRISES, INC.,<br><br>Reorganized Debtor. | Chapter 11<br>Bankr. Case No. 24-10349 (TMH) |
| ANDREW FOX,<br>Appellant,<br>v.<br><br>CHARGE ENTERPRISES, INC.,<br><br>Appellee. | C.A. No. 24-1424 (MN) |
| CRAIG DENSON and LEAH SCHWELLER,<br>Appellants,<br>v.<br><br>CHARGE ENTERPRISES, INC.,<br><br>Appellee. | C.A. No. 24-1426 (MN) |

**MEMORANDUM OPINION**

Joseph H. Huston, Jr., STEVENS & LEE, P.C., Wilmington, DE; Jason Manfrey, Robert Lapowsky, STEVENS & LEE, P.C., King of Prussia, PA – Counsel to appellant, Andrew Fox.

Kate R. Buck, Matthew J. Rifino, McCarter & English LLP, Wilmington, DE – Counsel to appellants, Craig Denson and Leah Schweller.

Douglas D. Herrmann, Kenneth A. Listwak, TROUTMAN PEPPER LOCKE LLP, Wilmington, DE; Harrison Denman, Laura Garr, WHITE & CASE LLP, New York, NY; Trudy Smith, WHITE & CASE LLP, Miami FL – Counsel to appellee, Charge Enterprises, Inc.

August 18, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

Appellants Andrew Fox, Craig Denson, and Leah Schweller (together, "the Appellants") have appealed the Bankruptcy Court's Memorandum Opinion and Order, *In re Charge Enterprises, Inc.*, 2024 WL 5131141 (Bankr. D. Del. Dec. 16, 2024) ("the Decision") which, among other things, sustained the post-confirmation claim objection filed by reorganized chapter 11 debtor Charge Enterprises, Inc. ("Charge" or "the Debtor") and subordinated the Appellants' proofs of claim for indemnification pursuant to section 510(b) of the Bankruptcy Code.

Following their appeals, Appellants filed motions for certification of direct appeal pursuant 28 U.S.C. § 158(d)(2)(A) on the basis that (1) there is no controlling Third Circuit precedent with respect to the issue of whether a contractual right of indemnification may be subordinated under section 510(b), (2) the appeal concerns a matter of public importance, and (3) certification will materially advance the progress of the case. (C.A. No. 24-1424 (MN), D.I. 9, 10; C.A. No. 24-1426 (MN), D.I. 9, 10 ("the Certification Motions"). The Certification Motions were fully briefed on February 28, 2025. On April 28, 2025, however, the parties jointly requested a stay of these appeals while they pursued mediation of their dispute. (*See* C.A. No. 24-1424 (MN), D.I. 19; C.A. No. 24-1426 (MN), D.I. 21) ("the Stay Request")). By Order dated May 9, 2025, the Stay Request was granted. (C.A. No. 24-1424 (MN), D.I. 21; C.A. No. 24-1426 (MN), D.I. 22).

On February 13, 2026, the parties stipulated to terminate the stay and proceed with the appeals. (*See* C.A. No. 24-1424 (MN), D.I. 22; C.A. No. 24-1426 (MN), D.I. 23). On May 8, 2026, the appeals were fully briefed. The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. For the reasons set forth below, the Certification Motions will be denied, and the Order will be affirmed.

# I. BACKGROUND

## A. The Plan and the Indemnification Claims

On March 7, 2024, Charge filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor's Combined Disclosure Statement and Prepackaged Chapter 11 Plan of Reorganization ("the Plan") (A000025–81)[1] was confirmed on April 24, 2024, and became effective on May 3, 2024. The Plan classifies all allowed and unsubordinated general unsecured claims in Class 4 (defined in the Plan) and provides for their payment in full. (A000038; A000057). The Plan further provides, however, that all Section 510(b) Claims shall be classified in Class 5 (defined in the Plan) to be discharged without recovery. (*Id.*). Section 510(b) Claims are defined in the Plan as "any unsecured, non-priority Claim that is subordinated in right of distribution to General Unsecured Claims or Preferred Interests, or both, by operation of section 510(b) of the Bankruptcy Code." (A000052).

Appellant Fox, Charge's former chief executive officer and chairman of the board of directors, filed proof of claim number 10032 (A000082–272) ("the Fox Indemnification Claim") for purported indemnification obligations and for an undetermined amount. The Fox Indemnification Claim references (A000234) the Indemnification Agreement dated February 7, 2023, between Charge and Fox (A001938-55) ("the Fox Indemnification Agreement") and attaches certain corporate governance documents and other documents not relevant to this appeal.

Appellant Denson, a former board member, chief operating officer, and interim chief executive officer, filed proof of claim 10016 based on an Indemnification Agreement dated February 7, 2023 (C.A. No. 24-1426 (MN), D.I. 20 at A000153-312), and appellant Schweller, former chief financial officer, filed proof of claim number 10028 (*id.* at A00001-152) (together

[1] Unless otherwise noted, citations to the record are to the Debtor's appendix in support of its answering brief on appeal (C.A. No. 24-1424 (MN), D.I. 24), cited herein as "A__."

with the Fox Indemnification Claim, "the Indemnification Claims") for purported indemnification obligations and for an undetermined amount. Each of their Indemnification Claims reference the Indemnification Agreement dated February 7, 2023 and attach certain corporate governance documents and other documents not relevant to this appeal.

**B. The Pending Litigation**

Appellants seek indemnification as they are the subject of two ongoing lawsuits alleging misconduct while serving as Charge's officers and directors. With respect to the first lawsuit, on May 28, 2024, David Finkelstein, in his individual capacity and on behalf of other similarly situated shareholders, filed a complaint in the United States District Court for the Southern District of New York ("the Securities Class Action") alleging that Appellants violated sections 10(b) and 20(a) of the 1934 Securities Exchange Act ("the Exchange Act"). (A000292–323).

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" *Genesee Cnty. Employees' Ret. Sys. v. DocGo Inc.*, 773 F. Supp. 3d 62, 79 (S.D.N.Y. 2025) (quoting 15 U.S.C. § 78j(b)). "Section 10(b)'s implementing rule, Rule 10b-5, expounds upon the statute, making it unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "Under the Supreme Court's interpretation of these provisions, a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5 consists of six elements: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Id.* (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,

552 U.S. 148, 157 (2008). Section 20(a) of the Exchange Act imposes liability for "controlling persons" (*e.g.*, directors and officers) for violations of section 10(b) of the Exchange Act. 15 U.S.C. § 78t(a). The complaint filed in the Securities Class Action raises specific allegations against Appellants that are based on (a) repeated misrepresentations about (i) the nature of Charge's relationship with a third party, (ii) the degree of control that particular third party exercised over Charge's assets that were critical to its liquidity, and (iii) the nature of the investments that such third party held on Charge's behalf and (b) the fact that Appellant and other directors and officers certified the strength and adequacy of Charge's internal disclosure controls even though there were issues related to such controls. (A000304–314; A000319–321).

With respect to the second lawsuit, on June 26, 2024, several parties filed a complaint in the New York Supreme Court against Appellants alleging fraudulent inducement or misrepresentation, negligent misrepresentation, and breach of fiduciary duties ("the Arena Litigation" and, together with the Securities Class Action, "the Pending Litigation"). (A000324–365). The complaint alleges Appellants' dereliction of their duties with respect to transactions between Charge and certain conflicted third parties, the unauthorized use of Charge's funds that was known or knowable to Appellants, and the misstatements that Appellants made to induce the plaintiffs into loaning Charge money and purchasing Charge's stock. (A000328–363).

Appellants submitted demands for advancement of attorney's fees and expenses to defend against the claims in the Pending Litigation. (A000366). The Debtor responded to these demands stating that the advancements were denied and that Appellants' proofs of claim filed in the chapter 11 case will be subject to a forthcoming objection. (A000367).

### C. <u>The Claim Objection and Decision</u>

On August 27, 2024, the Debtor filed an objection to the Indemnification Claims (A000368–2097) ("the First Claims Objection") that sought to classify the claims as a Section

510(b) Claim, which are subordinated under the Plan. Fox responded to the First Claims Objection on September 30, 2024, asserting that his Indemnification Claim is not subject to section 510(b) of the Bankruptcy Code and thus should not be subordinated because it is based on the Indemnification Agreement. (A002098; A002101–103). Denson and Schweller filed their joint response, asserting that the request to reclassify their Indemnification Claims was not properly before the Bankruptcy Court because such relief should have been brought in an adversary proceeding, as purportedly required under the Bankruptcy Rules. (C.A. No. 24-1426 (MN), D.I. 20 at A002043-55). Denson and Schweller did not raise any arguments with respect to the section 510(b) issue in their response. (*See id.*).

The Debtor filed an omnibus reply to these objections, arguing that the Fox Indemnification Claim arises from the purchase or sale of securities of the Debtor, and that the section 510(b) does not distinguish between contract claims, tort claims, or claims based on some other law. (A002399-2400). The Debtor's reply also addressed the procedural argument raised by Denson and Schweller, and countered that the Bankruptcy Rules permit the Debtor to file claim objections seeking to subordinate the claims pursuant to the terms of the Plan. (A002400-03). A hearing was held before the Bankruptcy Court on October 10, 2024, at which time the Bankruptcy Court took the matter under advisement.

On December 16, 2024, the Bankruptcy Court issued the Decision granting the First Omnibus Objection and classifying the Indemnification Claims (among others) as Section 510(b) Claims. *See In re Charge Enters.*, 2024 WL 5131141, at *9-12. The Bankruptcy Court applied the Third Circuit's test, which requires a "nexus or causal relationship" between the claim and the purchase or sale of securities. *See id.* at *9. The Bankruptcy Court determined that such nexus existed because both the Securities Class Action and Arena Litigation arose from alleged

misconduct during the sale of securities, and the Indemnification Claim, in turn, arose from those lawsuits. *See id*. at *12. The Bankruptcy Court rejected the argument that indemnification claims based on contract are exempt from section 510(b), finding that this section applies as long as the claim arises from the purchase or sale of the debtors' securities. *See id.* at *11.

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). "An order allowing or disallowing a claim is a final, appealable order." *In re Prosser*, 388 F. App'x 101, 102 n.1 (3d Cir. 2010) (quoting *Orsini Santos v. Mender,* 349 B.R. 762, 768 (1st Cir. BAP 2006)). A district court considering an appeal of a bankruptcy court order "review[s] the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its discretionary decisions for abuse of discretion." *In re Imerys Talc Am., Inc.,* 38 F.4th 361, 370 (3d Cir. 2022) (internal citation omitted).

## III. CERTIFICATION REQUEST

Under 28 U.S.C. § 158(d)(2)(A), the court of appeals has the discretion to exercise jurisdiction over an appeal taken directly from a bankruptcy court's ruling if the district court certifies that at least one of the following circumstances exist:

> (i) the ruling involves a question of law as to which there is no controlling decision of the court of appeals or of the Supreme Court, or involves a matter of public importance;
>
> (ii) the ruling involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the ruling to the court of appeals may materially advance the progress of the case or proceeding in which the appeal is taken.

*See* 28 U.S.C. § 158(d)(2)(A). Under § 158(d)(2)(B), the district court *must* make this certification if it determines that any one of these circumstances exist. *See* 28 U.S.C. § 158(d)(2)(B) ("If . . .

the district court . . . on its own motion or on the request of a party, determines that a circumstance specified in [§ 158(d)(2)(A)] exists[,] . . . the district court . . . ***shall*** make the certification described in subparagraph (A).") (emphasis added).

The Certification Motions present the following question of law: whether a contractual right of indemnification may be subordinated under section 510(b). Relevant here, section 510(b) mandates the subordination of claims arising from the purchase or sale of securities of a debtor:

> A claim . . . for damages arising from the purchase or sale of [a security of the debtor or an affiliate of the debtor] or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

### A. The Decision Does Not Present An Issue For Which There Is An Absence of Controlling Law

Appellants argue there is no controlling Third Circuit decision with respect to whether a contractual right of indemnification may be subordinated under section 510(b) of the Bankruptcy Code. Controlling law for the purposes of section 158(d)(2)(A)(i) is that which "admits of no ambiguity in resolving the issue." *In re Conex Holdings, LLC*, 534 B.R. 606, 611 (D. Del. 2015).

The Debtor argues that controlling law on this issue is set forth in the Third Circuit's decision, *Baroda Hill Invs. v. Telegroup, Inc. (In re Telegroup, Inc.),* 281 F.3d 133 (3d Cir. 2002).[2] Pursuant to that decision, the Debtor argues, "case law in this jurisdiction (and others) is clear: an

[2] In a bankruptcy court decision predating *In re Telegroup*, the Honorable Peter J. Walsh, C.J., held that "[t]he plain language of § 510(b), its legislative history, and applicable case law clearly show that § 510(b) intends to subordinate the indemnification claims of officers, directors, and underwriters for both liability and expenses incurred in connection with the pursuit of claims for rescission or damages by purchasers or sellers of the debtor's securities." *In re Mid-American Waste Sys., Inc.*, 228 B.R. 816, 824 (Bankr. D. Del. 1999).

indemnification claim – whether arising from a contract or otherwise – is subject to subordination under section 510(b)" if there is "some nexus or causal relationship between the claim[] and the purchase of the securities." (C.A. No. 24-1424 (MN), D.I. 14 at 11). *In re Teleglobe* is controlling precedent as to how the statute should be construed and the kinds of claims that fall within its ambit.

In *In re Telegroup*, shareholders asserted claims against the bankruptcy estate relating to the debtor's failure to register their shares, and those claims were ultimately subordinated pursuant to section 510(b). *See id.* at 134-35. As the actionable conduct (the debtor's breach of contract) occurred after the shareholders' purchase of the debtor's stock, the shareholders contended that their claims should not have been subordinated, taking the position that § 510(b) should be construed narrowly, such that only claims for actionable conduct – typically some type of fraud or other illegality in the issuance of stock – that occurred ***at the time of the purchase or sale of stock*** would be deemed to "aris[e] from" that purchase or sale. *See id*. at 135 (emphasis added). The Debtor, on the other hand, argued that section 510(b) must be read more broadly, such that claims for breach of a stock purchase agreement which "would not have arisen ***but for*** the purchase of Telegroup's stock, may arise from that purchase, even though the actionable conduct occurred after the transaction was completed." *See id*. (emphasis added).

In construing the statute, the Third Circuit observed at the outset that while the phrase "arising from" is ambiguous, it is "more natural, as a textual matter, to read 'arising from' as requiring some sort of nexus or causal relationship between the claims and the purchase of the securities." *Id*. at 138. The decision notes that "the text of § 510(b) is reasonably read to encompass the claims in this case, since the claims would not have arisen ***but for*** the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement." *Id*.

(emphasis added). To resolve the ambiguity, the Third Circuit turned to the available legislative history, noting several policy considerations, and concluding that the enactment of "Section 510(b) [] represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." *Id*. at 141 (citing legislative history recommending "that claims by stockholders of a corporate debtor for rescission or damages, which if allowed will promote them to the status of creditors, be subordinated to the claims of the real creditors"). And although the Third Circuit "agree[d] with claimants that claims alleging illegality in the issuance of securities fall squarely within the intended scope of § 510(b), we cannot find anything in the legislative history indicating that Congress intended to *limit* the scope of § 510(b) to *only* such claims." *Id*. at 140.

The Third Circuit ultimately rejected the shareholders' timing argument, which attempted to draw a distinction between actionable conduct that occurred at the time of the purchase of the security and actionable conduct that occurred after the purchase, as based on a distinction which "lack[ed] any meaningful basis as a matter of Congressional policy and therefore provides an inadequate resolution of the ambiguity in the text of § 510(b)." *Id*. "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding. Nothing in this rationale would distinguish those shareholder claims predicated on post-issuance conduct from those shareholder claims predicated on conduct that occurred during the issuance itself." *Id.* The Third Circuit agreed with the debtor that the claims, which arose after the purchase or sale of securities, were based on a "breach of the purchase agreement whereby

claimants acquired shares of the [debtor's] stock, which required [the debtor] to use its best efforts to register its stock," and were subordinated by operation of section 510(b). *Id*. at 136, 138.

Appellants assert that the *In re Telegroup* does not constitute controlling law with respect to the issue on appeal. (*See* C.A. No. 24-1426 (MN), D.I. 18 at 1-2). "Although *Telegroup* focused on 11 U.S.C. § 510(b)," Appellants argue that the Third Circuit's holding, which addressed shareholders' breach of contract claims arising from the purchase or sale of a security of the debtor, "offers little instructive value, if any, to Appellants' claims for the contractual right to advancement and indemnification relating to their *defense* of [such] claims." (*See id.* at 2).

*Telegroup* considered shareholder claims and did not specifically address indemnification claims of directors and officers, but the decision made two things clear. ***First***, there is no reason (based on either the statute or public policy) to treat contract claims any differently than tort claims:

> A comparison of appellants' [breach of contract] claims with claims for fraud or other illegality in the issuance of the debtor's securities, which appellants concede must be subordinated pursuant to § 510(b), further supports the subordination of appellants' claims. The policy considerations underlying the Congressional judgment in § 510(b) that those who purchase the debtor's stock, rather than general unsecured creditors, should bear the risk of loss caused by illegality in the issuance of the stock, seem to us to apply equally to the claims in this case. In both cases, the claim would not exist but for claimants' purchase of debtor's stock. In both cases, the claim seeks compensation for a decline in the stock's value caused by actionable conduct on the debtor's part. And in both cases, because the stockholder, as an equity investor, assumed the risk of business failure, the stockholder must bear the risk, in the event of bankruptcy, of any unlawful conduct on the debtor's part that causes the stock's value to drop.
>
> That the same policy considerations applicable to claims alleging fraud in the issuance of securities apply with equal force here is illustrated by considering a hypothetical case in which Telegroup did not contractually agree to use its best efforts to register its stock, but instead misrepresented to buyers at the time of the purchase that Telegroup was currently using its best efforts to register the stock. In such a case, the stockholders' fraud claims against Telegroup

> would clearly arise from the purchase of Telegroup's stock, and therefore would be subordinated pursuant to § 510(b). The only difference between that hypothetical and this case is that here, instead of fraudulently misrepresenting to buyers that it was using its best efforts to register its stock, Telegroup breached its contractual obligation to use its best efforts to register its stock.
>
> Given that the text of § 510(b) may be reasonably read to apply to both claims alleging fraud in the issuance and the claims in this case . . . we see no reason as a matter of policy why a fraud claim against Telegroup for misrepresenting to buyers that it was using its best efforts to register its stock should be subordinated under § 510(b), but a contract claim against Telegroup for breaching its agreement to use its best efforts to register its stock should not.

*In re Telegroup*, 281 F.3d at 143 (citing *In re Int'l Wireless Commc'ns Holdings, Inc.*, 257 B.R. 739, 746 (Bankr. D. Del. 2001) (explaining that "[m]any claims of 'defrauded' shareholders could be characterized as either [contract or tort claims]. Were we to limit the applicability of section 510(b) to tort claims, shareholders could easily avoid its effect by asserting that a debtor's fraudulent conduct in the sale of its securities was a breach of the sales contract.").

Second, based on its thorough review of legislative history, the Third Circuit did not "find anything in the legislative history indicating that Congress intended to *limit* the scope of § 510(b) to *only* such claims" alleging illegality in the issuance of securities. *Id*. at 140 (emphasis in original). "We therefore read the specific types of claims referred to in the legislative history as 'arising from' the purchase or sale of a security as illustrative, not exhaustive, examples of claims that must be subordinated pursuant to § 510(b)." *Id*.

In sum, the phrase "arising from" in section 510(b) does not examine whether the claim is based on contract or some other law and is not limited to particular types of claims. *See In re Telegroup*, 281 F.3d at 143. Section 510(b) is concerned with the nature and substance of the underlying claim, not the reason why a claimant is able to recover from the debtor. Whether a claim is ultimately one for damages "arising from" the purchase or sale of a security of the debtor

was the issue before the Bankruptcy Court and is the issue before the Court on appeal. As Appellants ultimately "dispute[] the application of existing controlling law to specific facts," the appeals do not satisfy the first subpart of § 158(d)(2)(A)(i). *See In re Nortel Networks Corp.,* 2010 WL 1172642, at *2 (Bankr. D. Del. Mar. 18, 2010).

### B. The Ruling Does Not Meet the Statute's Narrow Public Importance Standard

Courts have interpreted the "public importance" prong of 28 U.S.C. § 158(d)(2)(A)(i) narrowly. To constitute a matter of "public importance," the issue on appeal must be one that "transcend[s] the litigants and involves a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." *Am. Home Mortgage Inv. Corp. v. Lehman Bros. and Lehman Commercial Paper Inc.* (*In re Am. Home Mortgage Inv. Corp.*), 408 B.R. 42, 44 (D. Del. 2009) (quoting 1 *Collier on Bankruptcy* ¶ 5.05[A] (15th ed. rev.)). An appeal that affects only the parties, and not the public at large, generally does not meet the standard. *See In re Goody's Family Clothing, Inc.*, 2009 WL 2355705, at *2 (D. Del. July 31, 2009) (denying certification). "The bar for certification under [the public importance] standard should be set high." 1 *Collier on Bankruptcy* ¶ 5.06[4][b] (16th ed. 2025).

Appellants assert that the question presented in these appeals is a matter of public importance because it "will likely recur in future bankruptcy proceedings" and that a direct appeal to the Third Circuit "will help bring clarity" to the issue of whether indemnification claims that arise under a contract may be subordinated under section 510(b). (C.A. No. 24-1424 (MN), D.I. 10 at 7). Here, the Pending Litigation is the only reason for Appellants having filed Indemnification Claims against the Debtor. Directors and officers routinely assert indemnification claims in Chapter 11. As with similar claims in other Chapter 11 proceedings, the Bankruptcy Court applied the guidance and analysis set forth in controlling case law to determine whether officer and director indemnification claims must be subordinated in accordance with the statute. *See In re Charge*

*Enters.*, 2024 WL 5131141, at *9-12. That Appellants' claims arise under Indemnification Agreements does not elevate the matter to the statute's high bar, considering that claims of this nature are ordinarily brought based on contracts with the debtor.

Finally, contrary to the Appellants' assertions, the Bankruptcy Court did not "eviscerate[] all director and officer indemnification agreements in bankruptcy." (C.A. No. 24-1424 (MN), D.I. 10 at 7). Bankruptcy courts in this jurisdiction and others have declined to subordinate claims against a debtor when such claim ***does not*** fall within section 510(b)'s ambit. *See, e.g., In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 782 (Bankr. D. Del. 2004) (holding noteholder claims were not subject to mandatory subordination because they did not "arise from" the purchase or sale of a debtor's security and were thus "not the type of transactions section 510(b) seeks to subordinate"); *In re Universal Towers Constr., Inc.*, 632 B.R. 86, 90-91 (Bankr. M.D. Fla. 2021) (holding claim based on a prepetition share redemption was not subject to subordination under section 510(b) because it had become a fixed debt obligation, having lost the potential for any upside or profit the day it was redeemed, and thus the claim was "not the type which section 510(b) mandates be subordinated."). This makes sense because the inquiry does not turn on whether the right to indemnification arose vis-à-vis a contract; rather, courts are concerned with the nature of liability for which the party seeks to be indemnified. Thus, the appeals do not satisfy the second subpart of § 158(d)(2)(A)(i).

### C. Immediate Appeal to the Court of Appeals Will Not Materially Advance the Progress of the Case

The Appellant argues that certification will "materially advance the progress of the underlying bankruptcy case, the Debtor's consummation of its Plan, and the Class Action and New York Suit." (C.A. No. 24-1424 (MN), D.I. 10 at 7-8). As an initial matter, the parties' agreement to stay the Court's consideration of these appeals for over a year belies Appellants' argument that

this Court's review should be skipped in the name of expediency. More importantly, however, the Court agrees with the Debtor that neither the timing nor the completion of the appeals will have any effect on the bankruptcy proceeding, which is nearly concluded, as the Debtor's Plan went effective and was consummated over a year ago, and the claims reconciliation process is substantially finished. (C.A. No. 24-1424 (MN), D.I. 14 at 3, 18-19). The Court further agrees that the outcome of these appeals will have no impact on the progress of the Pending Litigation. Appellants assert that the losing party will appeal this Court's decision to the Third Circuit, so Charge will not be prejudiced because a further appeal is inevitable. (*See* C.A. No. 24-1424 (MN), D.I. 10 at 8). Such an argument is an insufficient basis to proceed with certification because "[t]his argument would apply to almost every case or proceeding where both sides are determined to fully pursue all appeals of right." *Faulkner v. Kornman*, 2012 WL 293230, at *4 (Bankr. S.D. Tex. Jan. 30, 2012). "If the mere expectation of advancement to a circuit court was sufficient to establish material advancement, Section 158(d)(2)(A) would effectively eliminate the district court from the bankruptcy review process altogether." *In re Lehman Bros. Inc.*, 2013 WL 5272937, at *5 (S.D.N.Y. Sept. 18, 2013). Thus, the appeals do not satisfy § 158(d)(2)(A)(iii).

Accordingly, the Certification Motions are denied.

## IV. <u>ANALYSIS</u>

### A. <u>The Bankruptcy Court Did Not Err in Subordinating Denson and Scheller's Indemnification Claims Outside of an Adversary Proceeding</u>

Appellants Denson and Schweller argue that Charge's request to classify the Indemnification Claims as Section 510(b) Claims under the Plan must have been brought in an adversary proceeding pursuant to Bankruptcy Rule 7001. The Debtor argues that its confirmed Plan contemplates a class of claims subordinated by operation of section 510(b), thus satisfying the exception to the general rule requiring an adversary proceeding to obtain such relief.

The Court agrees that Bankruptcy Rule 7001 permits parties to seek such relief when subordination is contemplated as part of a chapter 11 plan. *See* Fed. R. Bankr. P. 3007(b), 7001(h). Bankruptcy Rule 3007(b) states that "[i]n objecting to a claim, a party in interest must not include a demand for a type of relief specified in Rule 7001 but may include the objection in an adversary proceeding." Fed. R. Bankr. P. 3007(b). Bankruptcy Rule 7001 is clear that an adversary proceeding includes "a proceeding to subordinate an allowed claim or interest – except when subordination is provided in a Chapter 9, 11, 12, or 13 plan." Fed. R. Bankr. P. 7001(h). Here, the Plan provides for the subordination of Section 510(b) Claims in Class 5. (A000057) (providing that Class 5 Section 510(b) Claims follow Class 4 General Unsecured Claims in order of priority). Therefore, an adversary proceeding was not required to reach the issue of claim subordination. *See In re Washington Mutual, Inc.*, 462 B.R. 137, 145 (Bankr. D. Del. 2011) (holding "[a]n adversary proceeding is only required for claim subordination if subordination is not provided for under a chapter 11 plan. In this case, the Debtors' plan has provided for a class of subordinated claims. Therefore, an adversary proceeding is not required to reach the issue of claim subordination, and the Court will consider it in the context of the Debtors' Objection to [claimant]'s claim.").

The cases cited by Appellants are distinguishable, as none involve chapter 11 plans in which there was a class of subordinated claims.[3] Appellants raise two additional arguments in support of their position. First, Appellants argue that Section 502(b) lists various basis for filing

---

[3] *In re J.S. II, L.L.C.*, 389 B.R. 570, 587–88 (Bankr. N.D. Ill. 2008) (citing the exception for plans under Bankruptcy Rule 7001(h) but providing no indication that there was a plan with a class of subordinated claims); *In re Peck Jeep Eagle Inc.*, 2021 WL 1511640, at *1 (Bankr. S.D. Cal. Apr. 15, 2021) (providing no indication of a plan containing class of section 510(b) claims); *In re Protarga, Inc.*, 2004 WL 1906145, at *3 (Bankr. D. Del. Aug. 25, 2004) (same); *In re Arcapita Bank B.S.C.(c)*, 2014 WL 2109931 (Bankr. S.D.N.Y. May 20, 2014) (same).

a claim objection, and subordination is not one of them. Section 502(b) provides grounds upon which a court shall disallow a claim. 11 U.S.C. § 502(b). As the Debtor points out, it does not purport to be an exhaustive or exclusive list of all permissible bases for objecting to a claim. Subordination is not the same thing as disallowance of a claim. A claim can be fully allowed under section 502 but nevertheless subject to subordination under section 510(b). And where a confirmed plan contemplates a separate class for subordinated claims (as the Plan does in this case), the practical effect of sustaining such an objection is not disallowance but rather proper classification and treatment of the claim in accordance with its subordinated status. Courts in the Third Circuit have consistently treated subordination objections as proper claim objections because the alternative – permitting a holder of a section 510(b)-subordinated claim to participate in distributions alongside general unsecured creditors – would frustrate the statutory mandate of section 510(b) and the absolute priority rule that underpins chapter 11 plan confirmation. *See, e.g., In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999).

Second, Appellants argue that the Plan lists "subordination" under section 510 as one of the many actions considered as an "Avoidance Action" and therefore Charge had to bring its request for subordination in an adversary proceeding. (*See* A000045). The Court agrees that the Plan's "Avoidance Action" definition is a preservation mechanism, not a procedural mandate. Plans routinely define "Avoidance Actions" broadly to ensure that no potential cause of action is inadvertently abandoned or waived upon confirmation. Such a drafting convention says nothing about the procedural vehicle through which subordination must be sought. The source of Charge's right to object to a claim on section 510(b) grounds is the Bankruptcy Code itself (not the Plan), and that statutory right is not diminished by a plan definition.

The Bankruptcy Court committed no error in granting Charge's request pursuant to the First Claims Objection to treat the Indemnification Claims as Section 510(b) Claims.

### B. The Indemnification Claims Are Properly Subordinated Pursuant to § 510(b)[4]

#### 1. The Bankruptcy Court Correctly Applied Controlling Third Circuit Precedent

The Indemnification Claims were properly subordinated under section 510(b) of the Bankruptcy Code on grounds that those claims "aris[e] from" the purchase or sale of securities of

---

4 The Debtor asserts that Denson and Schweller's response to the First Omnibus Claim Objection raised the procedural argument that subordination under section 510(b) required an adversary proceeding, but that it did not argue that their contractual indemnification claims were not subject to subordination under section 510(b) because they are not claims arising from the purchase or sale of securities of the Debtor. (*See* C.A. No. 24-1426 (MN), D.I. 24 at 14). The Debtor is correct. (*See id.,* D.I. 20 at A002043-54). The Debtor further asserts that "[i]nstead, Appellants merely adopted those arguments at oral argument with no development" as to how those arguments apply to them. (*See id.*, D.I. 24 at 15). Denson and Schweller disagree, contending that "[t]hese contractual arguments were raised by counsel for the Officers," and citing the transcript of the October 10, 2024 oral argument. (*Id*., D.I. 27 at 1 (citing *id*., D.I. 20, A002142-47)). The transcript reflects the following:

> COUNSEL: The first question before Your Honor today is a simple matter of procedure. Did the debtor's Chapter 11 prepackaged plan provide for subordination -- . . . -- of Craig Denson and Leah Schweller's claims? For the reasons stated in our clients' papers that were filed and articulated on behalf of Mr. Fox, all of which I am incorporating by reference, the answer is a resounding no. Accordingly, the debtor's first omnibus objection to Claim 10016, filed by Craig Denson and Claim 10028, filed by Leah Schweller, . . . should be dismissed.

(*Id*., D.I. 20 at A002142-43). Counsel also stated that, "[l]ike Mr. Fox, Mr. Denson and Ms. Schweller's contractual claims are for indemnification," but this argument was, again, made in the context of Appellants' argument that seeking a subordination determination via the First Claims Objection was procedurally improper and that such a request required an adversary proceeding. (*See id*. at A002144 (COUNSEL: The debtor said that this is the procedurally proper vehicle for doing so, but a quintessential 510(b) claim needs an adversary complaint, that is the proper procedure. ***Like Mr. Fox, Mr. Denson and Ms. Schweller's contractual claims are for indemnification, not an effort to convert an equity claim into a general unsecured claim.*** And we believe that the case law supports our position that, under Rule 7001-8, this case requires an adversary). Finally, counsel stated later in the hearing that "[they] want to join and adopt for the record the arguments of Mr. Fox." (*Id*., A002156).

the Debtor. Although the term "arising from" in section 510(b) has been found to be ambiguous, the Third Circuit clarified its meaning in *In re Telegroup,* explaining that it requires a "causal relationship" or "some nexus" between the claim and the purchase or sale of the debtor's securities. *See In re Telegroup*, 281 F.3d at 138, 143–44, & n.2 (indicating that a causal relationship may exist when there is a "but for" nexus between the claim and the purchase or sale). As discussed, in doing so, *Telegroup* made clear that there was no reason (based on either the statute or public policy) to treat contract claims any differently than tort claims. *Id.* at 143. As the leading bankruptcy treatise explains, it is the subject matter of the claim that matters:

> Section 510(b) provides for the mandatory subordination of claims "arising from" a securities transaction. Courts have viewed this language as ambiguous, generally interpreting the provision broadly to include a wide variety of causes of actions arising out of securities transactions. Under this broad reading, the claim need not flow directly from the securities transaction or arise contemporaneously with the purchase or sale of a security, but will be viewed as "arising from" a securities transaction if the transaction is part of the causal link leading to the injury.

4 *Collier on Bankruptcy* ¶ 510.04, at 3 (16th ed. 2026) (citations omitted).

Consistent with this interpretation, the Bankruptcy Court determined that the subject matter of the Indemnification Claim was the underlying litigation for which Appellant seeks indemnification. *In re Charge Enters.*, 2024 WL 5131141 at *11 ("Both suits therefore arose out

---

This is at most a passing reference to the argument that contractual indemnification claims do not fall within the ambit of section 510(b). The Court agrees with the Debtor that similarities between Appellants' and another party's circumstances are insufficient to alleviate the Appellants of their burden to present and develop the argument as applied to them. Appellants therefore have waived (or forfeited) this issue by making only a passing reference to it and failing "to make arguments and cite authorities in support of [the] issue." *Rubinstein v. Yehuda,* 38 F.4th 982, 995 (11th Cir. 2022) (internal citation omitted); *In re Revstone Industries*, 690 F. App'x 88, 90-91 (3d Cir. 2017) ("[A]rguments raised in passing . . ., but not squarely argued, are considered waived.") (citation omitted). But even assuming the substantive argument was properly raised below and preserved for appeal, those arguments fail for the additional reasons set forth herein.

of alleged misconduct during [Appellants'] sale of securities, and their litigation claims arose from that litigation. That misconduct during the sale of securities thus led to the indemnification at issue here."). Appellants admit that they each sent a demand letter to Charge for indemnification based on the Securities Class Action. (*See* C.A. No. 24-1424 (MN), D.I. 20 at 6; C.A. No. 24-1426 (MN), D.I. 20 at 7). Appellants also admit that the Pending Litigation raises claims based on federal securities law and common law and are both related to Appellant's alleged misconduct concerning Charge's issuance of securities. (*See* C.A. No. 24-1424 (MN), D.I. 20 at 3–4; C.A. No. 24-1426 (MN), D.I. 20 at 6-7). There would be no reason for Appellants to seek indemnification from Charge but for the Pending Litigation that seeks to hold them liable for alleged misconduct. As such, the causal link between the Indemnification Claims and the purchase or sale of Charge's securities is clear.

Appellants attempt to circumvent this reality by arguing that the Indemnification Agreement would exist regardless of whether there was any pending litigation. (*See* C.A. No. 24-1424 (MN), D.I. 20 at 18; C.A. No. 24-1426 (MN), D.I. 20 at 27). Although this is true, as the Debtor explains, the fatal flaw with this contention is that Appellant would not have an Indemnification Claim ***but for*** the Pending Litigation. In other words, Appellants would have no liability for which they needed to be indemnified if they were not being sued. The mere existence of the Indemnification Agreement is not enough; there must be some potential or actual liability that would trigger the terms of the Indemnification Agreement and precipitate Appellant's need for indemnification. (*See* A000278–280 (making clear that there is no automatic, unconditional obligation to indemnify)). The Bankruptcy Court recognized that and correctly examined the substance of the Indemnification Claims, which derives from the claims raised in the Pending

Litigation, to find that such Claims are based on the purchase or sale of Charge's stock and should be subordinated under section 510(b).

Ultimately, section 510(b) draws no distinction between a claim based on a contract, a statute, or some other law. *See* 11 U.S.C. § 510(b); *see also, e.g., In re Washington Mut., Inc.,* 464 B.R. 656, 669–70 (Bankr. D. Del. 2012) (collecting cases)*; In re Walnut Equip. Leasing Co., Inc*., 1999 WL 1271762, at *6 (Bankr. E.D. Pa. Dec. 28, 1999) (stating that the language of section 510(b) "is sufficiently broad to include any claim for indemnification of defense costs incurred in connection with a lawsuit seeking damages arising from the purchase or sale of securities regardless of whether the indemnification obligation is based on a statute, a contractual agreement or otherwise"). Courts construing this provision cannot read such a distinction into the provision when none exists. *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236 (3d Cir. 2004) ("[W]hen a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code.") (internal citations omitted).

**2. <u>Legislative History Supports the Decision</u>**

Appellants further argue that, "given the ambiguity in the statute . . ., the Bankruptcy Court erred in failing to construe section 510(b) consistent with its legislative history and purpose." (C.A. No. 24-1424 (MN), D.I. 20 at 19; C.A. No. 24-1426 (MN), D.I. 20 at 28). This argument is unclear, as the Decision cites and expressly relies on cases resolving that ambiguity based on legislative history and purpose. "Section 510(b) does not require that the injury directly result from the purchase or sale of securities; it only requires some nexus or causal relationship between the claim and the purchase or sale of securities." *In re Charge Enters.,* 2024 WL 5131141, at *10 & n.57 (citing *In re Teleglobe*, 281 F.3d at 138). Building on *Teleglobe*, the Decision explains:

> In the past, this Court has extended section 510(b)'s subordination of claims to indemnification claims by directors and officers. For example, Charge cites to *In re Mid-American Waste Systems, Inc.*

> . . . There, this Court explained that the rationale for section 510(b) subordination is not limited to preventing shareholder claimants from improving their position; rather, it is also meant to subordinate claims based on risk allocation. Under those principles of risk allocation, this Court reasoned, subordination of a director's or officer's indemnification claim arising out of a purchase or sale of securities would further the policies that underly section 510(b).
>
> This Court then reiterated that reasoning in *In re Touch America* . . . again finding that directors' and officers' indemnification claims should be subordinated under section 510(b). There, this Court explained that subordination requires consideration of the underlying nature of the claims . . . [P]laintiffs . . . exchanged value for the stock, bringing the transaction into the definition of a purchase or sale of securities. Then, because the directors and officers were requesting indemnification for defense of the litigation arising from that transaction, the indemnification claims also arose from the purchase or sale of securities.
>
> The present case follows a similar pattern, whereby the indemnification claims at issue ultimately arose from the purchase or sale of securities and thus should be subordinated. Under Third Circuit jurisprudence, whether a claim arises from the sale or purchase of securities "require[s] some nexus or causal relationships between the claims and the purchase of securities." ***Such nexus is present here between the purchase of Charge's stock and the indemnification claims. For both sets of claims, a purchase or sale of securities caused the litigation, which caused the indemnification claims.***

*In re Charge Enters.,* 2024 WL 5131141, at *10 (citations omitted) (emphasis added).

In any event, legislative history supports the Decision. Section 510(b) was amended in 1984 to include claims for reimbursement or contribution on account of damages or rescission of a claim. *See In re Lehman Bros. Inc.*, 808 F.3d 942, 948 (2d Cir. 2015). Although this amendment did not include corresponding legislative history material, the addition of this clause was a "broadening measure[]." *Id*. The inclusion of reimbursement and contribution claims added to the scope of section 510(b) "new classes of persons and entities involved with the securities transactions giving rise to the rescission and damage claims." *In re Mid-Am. Waste Sys., Inc.*,

228 B.R. 816, 826 (Bankr. Del. 1999). "Congress intended the holders of securities law claims to be subordinated, so why not also subordinate claims of other parties (e.g., officers and directors and underwriters) who play a role in the purchase and sale transactions which give rise to securities law claims?" *Id.*

Courts in this circuit have agreed. For example, in *Touch America*, the bankruptcy court found that the directors' and officers' indemnification claims based on "employment, indemnification, severance, or other agreements" with the debtors should be subordinated because such claims were being asserted on account of pending civil litigation. *In re Touch Am. Holdings*, 381 B.R. 95, 106 (Bankr. D. Del. 2008). Plaintiffs in that litigation asserted breach of fiduciary duty claims under ERISA against the directors and officers for decisions made in connection with the debtor's employee stock contribution plan, and the directors and officers filed indemnification claims. *Id.* at 103. "The plain language of [] section [510(b)] is broad enough to include indemnification claims for both liabilities and expenses incurred on account of a claim for 'damages arising from the purchase or sale' of the debtor's or its affiliate's securities." *Id.* at 103. The bankruptcy court focused on the nature of the liability that gave rise to the claimants' indemnification claims – rather than the governing document that gave claimants' the right to bring such claim – and held the indemnification claims must be subordinated. *See id.* at 104-06.

Appellant asserts that contractual claims by directors and officers for indemnification render them more like general unsecured creditors than equity holders, thus weighing against the policies advanced by section 510(b). (*See* C.A. No. 24-1424 (MN), D.I. 20 at 18). This argument is not compelling. First, "claims alleging fraud or other illegality in the issuance of securities" are "at the core of the claims that 'arise from the purchase or sale of . . . a security' for purposes of § 510(b)." *In re Telegroup,* 281 F.3d at 140 (internal citation omitted). As the Bankruptcy Court

explained, the Securities Class Action alleges that Appellant made certain misrepresentations in violation of Section 10(b) of the Exchange Act, which makes it illegal to use any deceptive device in connection with the purchase or sale of securities. *See In re Charge Enters.*, 2024 WL 5131141, at *2-3. Similarly, the Arena Litigation alleges that Appellants "committed fraudulent inducement/misrepresentation, negligent misrepresentation, and breach of fiduciary duties in [their] sale of securities." *See id*. at *3. Under these facts, the directors and officers should bear the risk of an illegal securities transaction when they are "in [the] better position" – considering their insider role at the security issuer – "to evaluate such risk [compared] to the general unsecured creditors." *See In re Mid-Am. Waste*, 228 B.R. at 828; *see also In re Lehman Bros.*, 808 F.3d at 950 n.9. As such, Appellants – former Charge insiders – are more like a shareholder in their assumption of the risk in engaging in the securities transaction than a general unsecured creditor.

Second, Congress intended section 510(b) to "prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of a bankruptcy." *In re Telegroup*, 281 F.3d at 142. In other words, Congress did not want "claims emanating from tainted securities law transactions [to] have the same priority as the claims of general creditors of the estate." *In re Mid-Am. Waste*, 228 B.R. at 826. Here, plaintiffs in the Pending Litigation are former shareholders of Charge. Assuming these shareholders recover damages from Appellants, and Appellants turn to Charge as unsecured creditors to be repaid for the amount paid to the shareholders, then the shareholders will have achieved the exact result Congress sought to prevent. The Court agrees agree with the Debtor that such "roundtripping" of claims arising from securities transactions is exactly what section 510(b) was designed to prevent. Thus, Appellants' claims were properly subordinated – not eliminated – to a priority status after general unsecured claims and treated in accordance with the Plan.

The Bankruptcy Court did not err in construing section 510(b) consistent with *In re Teleglobe*, which resolved any ambiguity in the statute based on legislative history and purpose, and the exception Appellants want to create for directors and officers with an indemnification agreement would not align with either.

### 3. <u>Decisions Cited by Appellants Do Not Support Reversal</u>

Appellants' reliance on *CIT Group* is misplaced as it is based on different facts. *In re CIT Grp. Inc.*, 460 B.R. 633 (Bankr. S.D.N.Y. 2011), *aff'd*, 479 F. App'x 393 (2d Cir. 2012). CIT Group arose in connection with a spin-off of a subsidiary from its former indirect parent, in which that parent divested itself of the subsidiary via a complex, multi-step transaction consisting of, among other things, an IPO, and after which the parent ceased to be a shareholder of the subsidiary. *See id*. at 635-36. A core aspect of this transaction was a tax agreement pursuant to which the subsidiary agreed to pay the parent amounts measured by the tax benefits the subsidiary realized from certain pre-transaction tax attributes. *See id*. at 636. When the subsidiary filed for bankruptcy, it rejected this tax agreement, and the parent filed a proof of claim for rejection damages, which the subsidiary sought to subordinate under section 510(b) on the premise that the tax agreement was an "integral part" of the spin-off and therefore connected to the relevant subsidiary securities issuance. *See id*. at 635. The court in *CIT Group* held that the "causal connection between the purchase and sale of a security" was too remote to warrant subordination; the claim involved a duty to pay money under a tax agreement, which was one of several documents that had been executed at the time of a spinoff, and the underlying sale of stock was an IPO to third-party purchasers, not to the claimant. *See id*. at 635–36. Similar facts are not present here. Appellants' claims for potential liabilities relate directly to their alleged misconduct during the issuance of securities, whereas the liabilities in *CIT Group* were tax-related and the nexus to the debtor's securities was attenuated.

As the Debtor points out, the same court that issued the *CIT Group* decision agrees that subordination is warranted on facts like those before the Court. *In re Jacom Computer Servs., Inc.*, 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002) ("[Section] 510(b) intends to subordinate the indemnification claims of officers, directors, and underwriters for both liability and expenses incurred in connection with the pursuit of claims for rescission or damages by purchasers or sellers of the debtor's securities") (quoting *In re Mid-Am. Waste,* 228 B.R. at 824). In *Jacom*, the debtor's underwriters asserted an indemnification claim against the estate for costs incurred defending a securities class action (just like Appellants in this case) that was filed against both underwriters and the debtor in connection with the debtor's IPO. *See id*. at 571. The underwriters argued that their claim arose solely from an indemnification and contribution provision in the underwriting agreement and therefore did not "aris[e] from" the purchase or sale of a security within the meaning of section 510(b). *Id*. at 572. The court rejected that argument, reasoning that section 510(b)'s "reimbursement or contribution" language encompasses indemnification. *Id*. (internal citations omitted). *Jacom* further endorsed the Bankruptcy Court's decision in *Mid–American Waste* – a case Appellants wants this Court to reject – noting that a core underlying rationale here is that "[parties like] underwriters are in a better position to allocate risks associated with the issuance of securities and that it is inconsistent with the policies articulated in the legislative history of section 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs." *Id*. As a result, the court subordinated the underwriters' indemnification claims.

Appellants' attempts to distinguish their appeals from other cases in this Circuit are not compelling. Appellants take issue with *Mid-American Waste* on grounds that it found the term "arising from" to be unambiguous whereas the subsequent *Telegroup* case did not. (*See* C.A. No. 24-1424 (MN), D.I. 20 at 14–15). This difference in statutory interpretation, however,

is of no consequence because the policy considerations and rationale applied in *Mid-American Waste* supporting subordination of director and officer claims for indemnification is consistent with *In re Telegroup*'s holding that claims subject to section 510(b) subordination are not limited to those held by shareholders so long as they bear a causal connection or some nexus to the purchase or sale of securities of the debtor. Appellants also seek to draw a line between indemnification claims that arise under a corporation's charter in the *Mid-American Waste* case and the indemnification agreement in this case. Doing so creates a distinction without a difference, however, because section 510(b) is not concerned with the basis for a claimant's ability to recover against the issuing corporation, but rather the substance of the claim.

Appellants further argue that *In re Touch America* wrongly focused on the "relationship of the underlying litigation to the sale of securities" and "inexplicably found that officers and directors assume the risk and return expectations of a shareholder, rather than a creditor." (C.A. No. 24-1424 (MN), D.I. 20 at 15–16) (citations omitted)). *In re Touch America* is clear that the universe of claims subject to subordination section 510(b) is not limited to shareholder claims. *In re Med Diversified, Inc.,* 461 F.3d 251, 258 (2d Cir. 2006) ("[A] claimant need not be an actual shareholder for his claim to be covered by the statute"); *In re Walnut Equipment*, 1999 WL 1271762, at *6–7 (explaining "the language of § 510(b) does not limit its application to any particular type of *claimant*, but, rather, focuses on the type of *claim* possessed"); *In re Telegroup*, 281 F.3d at 144 n.2 ("Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happened to be a shareholder . . ."). The *In re Touch America* court, relying on *Telegroup* and other circuit court decisions, recognized that the plaintiffs in the underlying litigation "took on the risk and return expectations of shareholders" concerning their ERISA plan; and the defendant officers and directors made the decision to continue the plan's

investment in a particular stock despite allegedly knowing "that the stock was a high risk investment that was steadily declining in value." *In re Touch Am.*, 381 B.R. at 106. There, just as the plaintiffs' decision to invest was a risk calculus, so was the officers' and directors' choice to continue such investment. *See id.*

In sum, there is no error in the Bankruptcy Court's determination that Appellants' Indemnification Claims are subordinated by operation of section 510(b).

### C. The Indemnification Claims Are Properly Cancelled, Released, and Extinguished Pursuant to the Plan

As set forth above, the Bankruptcy Court correctly determined that subordination of the Indemnification Claims is required under section 510(b). The Plan operated to cancel, release, and extinguish Class 5 Section 510(b) claims pursuant to its terms. Because the Bankruptcy Court's Decision will be affirmed, the treatment of the Indemnification Claims under the Plan remains unchanged.

## V. CONCLUSION

Accordingly, the Certification Motions will be denied, and the Decision will be affirmed. The Court will issue an Order consistent with this Memorandum Opinion.